Mr. Farrell. Thank you, Your Honor. My name is Cliff Farrell, representing Ms. Drummond, and I do ask for three minutes for rebuttal. Ms. Drummond filed her application for benefits in the current application in 2020. Prior to that time, she had worked when she'd been in the military for four years and then worked for Social Security herself. And the record reflects that she'd had depression problems going back at least to 2010. But something happened at her alleged onset date in, sorry, her amended onset date, and she snapped and left work. She'd had problems with PTSD and depression. There's no question about the severity of the problems. She'd also had physical problems, which the judge considered. The time of the hearing, she was 50 years old, and her described testimony at the hearing was basically she didn't do much. It was a video hearing. She could cook, but usually what she did was make a sandwich or have a simple meal. The household chores, the activities of daily living, the things that normally get done, either her two children who were ages at that point in time, 16 and 17, or her husband did them. There were days she didn't get up. There were days she got up and watched TV. Maybe once or twice a week she'd go to get medications. Basically, parenting activities were all deferred to her husband, and all she could do was try and stay basically isolated. During that time, at least 2010, she'd had regular counseling and therapy. In 2015, she changed therapists in the same practice and started seeing Ms. Somadi, who is the therapist whose opinions are part of what are at issue here. Ms. Somadi saw her on a weekly, bi-weekly basis, sometimes as needed. In the six years between October of 2015 and October of 21, the time frames in which she was discussing in her narrative reports, that would have been a minimum of 70 to 100, maybe as many as 150 times she'd had an interaction with her. She provided the letters and assessments that appear in the record, joint appendixes, pages 511, 559, 560, 565. Ultimately, Social Security decided to send Ms. Drummond out for another evaluation, and that doctor wrote a great report from my perspective. Explained what he observed, what was going on, how she reacted. She appeared tearful, she was difficult, was disheveled in appearance, things that you don't normally see very often in a Social Security. Rejected the assessments of both the consultant and the treating therapist. I'm not a big fan of the language of not entirely consistent with the medical and other evidence in the record, but that's the decision. I think Arrakis questions the reliability of that. In this case, we have a therapist who provided identified limitations. We have a consultant for Social Security who, in some regards, provided even more significant degrees of limitation. And then, in order to work around them, I think the judge made a false equivalency. Why isn't this just an evidentiary question? Weighing the testimony of Dr. Samardi, who is the plaintiff's main witness, against Dr. Luther, who painted a substantially different picture and listed the kinds of activities she could engage in. And the ALJ says, I guess the ALJ says, I'm going to credit Dr. Luther because Dr. Samardi's testimony was thin and there was no supplemental information that was necessary, and particularly as respects the sort of longitudinal progression or lack thereof over the course of a number of years of therapy. So I'm wondering, you know, why does this case involve anything more than a question of an ALJ crediting one witness and not another? Because the standards of evaluating supportability and consistency require the evaluation of those records and those reports. Dr. Luther saw the claimant far less. And even in her records, there was only one time where I was able to find that she thought things were well controlled. The rest of the time, she always referred to her mood as being euthymic. It doesn't mean she's got a normal mood. It means that her mood is at a plateau between her manic phases and her depressive phases. So even Dr. Luther is supporting, and Dr. Luther is really not treating her. All she's doing is for the mental health. All she was doing was prescribing medications because the therapist, Samardi, couldn't prescribe the medications. So she notes that, Ms. Luther notes that there are problems of time where the client... Have you ever said that a doctor prescribing medications to somebody is not a treating physician? And that seems like an odd, I've never heard that line before, right? To say that the doctor was not treating her because she was only providing the medications that were necessary to treat her? I guess I just don't understand the argument that the doctor is not a treating doctor when they're the ones prescribing. She clearly was a treating physician, but was not performing the intensive psychological evaluations or the psychiatric therapy. That was being left to the therapist. The reasons could be financial, I don't know. Was the allegation that the doctor was improperly prescribing drugs? No, no, no, no, no, no, no. She was aware that the client was depressed and was prescribing her depression and then would make notes. She made a few notes about her mood being euthymic. One time she noticed she was crying in the office, so she was aware of it enough to prescribe medication, but the primary treatment source was the therapist, Ms. Sarmadi. In fact, the psychologist who Social Security chose to examine her supported Ms. Sarmadi. Based on his evaluation, the limitations that were described would have been more preclusive. The point where the consistency and the supportability is, and the judge inadequately addressed, is she's not going to be able to make it through a normal day. She's not going to be able to make it through a normal week. She's going to have problems with her attendance. If you consider nothing else, just that one, there were a number of other limitations where they agreed were significant. Even if you look, the judge's decision says, mental status examination shows labile mood, dysphoric effect, disheveled appearance, fearful demeanor, below average working memory skills, moderately compromised delayed recall, below average abstraction, insight, and compromised judgment. Those are what the judge finds are significantly limited and supported by the record, and that's Joint Appendix 31. The rejection of those is based on the fact that she was able to cooperate during a one-hour examination with a doctor and had good eye contact and normal language. The fact that she has normal language says nothing about whether she's going to be, I'm sorry, that last was Joint Appendix 32. The fact that she has normal language or that she can make eye contact has nothing to do with whether or not she can make it through an eight-hour day, five-day a week job setting. I mean, this lady, at different points in the record, was never suicidal, but she was homicidal. I don't know many employers that would want somebody there that works that is in that kind of mood. And the Joint Appendix, all the medical. I mean, we have these cases that bottom out on supportability and consistency, and I think the ALJ addressed both supportability and consistency, saying that Dr. Samardi, his opinion or her opinion was very thin, that it wasn't backed up, that there were conclusory statements that weren't backed up sufficiently by any kind of supporting information. And the whole purpose of the supportability prong of these inquiries is to get behind the conclusory statements. And the ALJ said that that didn't happen here. They wanted an explanation other than just the statement of a conclusion. And then when you get to the consistency prong, you've got Dr. Luther's testimony, and he lists a good number of the daily tasks that the plaintiff here could perform. And what Dr. Luther said completely contradicted what the plaintiff's main witness was. So there's a consistency problem that Dr. Luther's testimony raises, and the supportability prong is a difficulty there because you get these conclusions, and they're just not backed up sufficiently by supporting evidence. So it wasn't as if the ALJ was clueless as to what needed to be proven or inquired into. And, I mean, where is the reversible error? I assume my time has expired. Would you mind addressing that on your rebuttal? That would be fine, Your Honor. Thank you. Okay, that would be good. All right, Ms. Wesnowski. Good. Thank you, Your Honor, and may it please the Court. My name is Carolyn Wesnowski, Assistant United States Attorney, representing the Commissioner. The sole issue before the Court this morning is the administrative law judge's evaluation of plaintiff's mental health impairments. Specifically, the ALJ's finding that the opinions of plaintiff's mental health counselor, Ms. Sarmadi, were only partially as opposed to fully persuasive. Plaintiff claims that the ALJ did not properly evaluate Ms. Sarmadi's opinions for consistency or supportability. The main factors an ALJ is required to address when evaluating medical opinions. However, this is incorrect. The ALJ's 21-page opinion gives a careful and considered evaluation of Ms. Sarmadi's opinions and addressed both factors at length, comparing them with the record evidence before explaining why she found them to be only partially persuasive. Now, Fourth Circuit precedent dictates that only a logical bridge between the ALJ's conclusions and the record evidence is required. The ALJ here more than supplied such a bridge and did so based on substantial evidence in the record. As the ALJ explained, Ms. Sarmadi merely checked several boxes on a form supplied by plaintiff's disability advocate that she had marked limitations in two areas of functioning due to her mental health conditions, which consisted primarily of depression, bipolar disorder, and PTSD. But during the relevant period, February 27, 2019, through the end of 2020, plaintiff's medical records tell an entirely different story. During the 22 months, plaintiff saw her primary care physician, Dr. Sylvia Luther, six times. That's about once every three or four months, and checked in several more times for refills on her medication. During this entire time, Dr. Luther diagnosed plaintiff's depression as in full remission. Indeed, plaintiff's depression merited only one mention in all of Dr. Luther's treatment notes, as opposed to the many times that plaintiff brought up other issues that were ailing her, such as her asthma and back and foot problems. And that was in August of 2020, when Dr. Luther recorded plaintiff as noting that she remains on Lexapro and feels it helps mood, although she is still bothered by thoughts of acting out against people, but, quote, consider these impulses to be out of character for her. Yet even then, as on all other occasions, Dr. Luther reported plaintiff as having no anxiety and no depression, and that plaintiff had screened negative on testing for depression and PTSD. Now, plaintiff's treatment consisted of mostly medication, primarily Lexapro, and therapy with Ms. Sarmadi that took place once or twice a month. In December of 2018, two months before plaintiff's onset period, Dr. Luther reported that plaintiff's depression was well-controlled on current therapy and meds. Plaintiff takes issue with the ALJ's characterization of plaintiff's treatment as routine and conservative, but that's a fair description given that plaintiff was on Lexapro, a very commonly prescribed drug for depression, and at the hearing testified she attended therapy only once a month. There's no evidence that plaintiff's symptoms or conditions were so severe as to require hospitalization, inpatient treatment, or a more serious medication such as a tranquilizer, antipsychotic, or mood stabilizer. And there's no indication here that plaintiff either requested or was referred to a psychiatrist. Simply put, there is nothing in Dr. Luther's ongoing treatment records that indicate that plaintiff had a severe mental health disorder that markedly limited her ability to function. You don't think that bipolar is a severe DSM-III diagnosis? You don't think that's a severe DSM-III diagnosis, mental health? No, I apologize, Your Honor, I misspoke. I agree it's a severe mental health condition, and the ALJ noted that it was a severe condition in her report. What I was saying was that it is not a severe mental health condition that is markedly limiting her ability to function in a work environment. And for example, the ALJ found that her mood reportedly has improved with medication. However, this is a JA-30 and 739. It cited that the decision only refers to the fact that she was taking medication used. It doesn't say anything about it was reported to be improved. Where did that come from? Well, I believe, as I just stated, there are several sites in the record where plaintiff is reporting that she's doing well on medication. What I think the ALJ is referring to is a treatment note before the onset period with Dr. Luther, where she's saying that her mood did indeed improve with Lexapro. All right. And furthermore, on the issue of supportability, as Your Honors have noted, the ALJ found that there was no way to know if Ms. Sarmadi's treatment notes would have supported her opinions because Ms. Sarmadi did not submit them to the ALJ. It is true that Ms. Sarmadi was not required to submit those notes, but without them there was no basis to determine whether Ms. Sarmadi's conclusions were supported by objective medical evidence. Ms. Sarmadi's opinions consisted of two letters that were dated 10 months apart that were nearly identical and only provided a list of her diagnoses, her symptoms and triggers, and consisted of a single paragraph that was intended to summarize six years of treatment. And only one of those two letters was even within the relevant period. Nor do the disability advocate-supplied forms that Ms. Sarmadi checked boxes on constitute a special report. These forms were filled out in October 2021, which was 10 months after plaintiff's last insured date, and they provide no details as to the consistency, pace, or severity of plaintiff's symptoms over a five-year treatment period. Nor did Ms. Sarmadi clarify how often she saw a plaintiff over this time period. Mr. Farrell hypothesized that it could have been up to 150 times. However, Ms. Sarmadi did not say how often she actually saw her, only that it was weekly, biweekly, or as needed. When Ms. Sarmadi was asked to explain her clinical findings and why those merited the limitations she prescribed, she left those sections on the form blank. Given the lack of any explanation or detail, it is no wonder that the ALJ found Ms. Sarmadi's opinions lacked supportability. Perhaps recognizing this, at the hearing, plaintiff's advocate stated that he was not asking the ALJ to find Ms. Sarmadi's opinions independently persuasive, that is, supported by themselves, but rather supported by the opinions of Dr. McCleary, the one-time consultative examiner. However, the ALJ only found Dr. McCleary's opinions partially persuasive because they were internally inconsistent and, again, unsupported by medical record evidence. And here, plaintiff does not challenge the ALJ's findings as to McCleary, only Sarmadi. In any event, the ALJ did not wholly reject Ms. Sarmadi's opinions. To the contrary, the ALJ did find that Ms. Sarmadi's treatment relationship and some of her clinical findings did support findings of moderate limitations. Taking all this into account, the ALJ was only partially persuaded by Ms. Sarmadi's opinion, a finding which was supported by substantial evidence, which is not by itself a high bar. Accordingly, the court asked this court to affirm, that the district court's decision to uphold the ALJ's finding, that plaintiff was not disabled during the relevant period. And that's based solely on the medication that it didn't ramp up? Her medication didn't ramp up? I mean, for example, the report from Dr. Sarmadi is that she was treated since 2015, right? Yes, Your Honor. She has frequent mood, impulse control problems, right? Swings. She's highly excitable, irritable at times, can be easily triggered by environmental stimulations, surroundings including people, driving a heavy truck. She frequently expresses she's easily triggered by other people and feels unable to control her anger around others. It's a work environment. Don't you have to work with other people? Yes, Your Honor. And the ALJ did take those opinions into account? Very little into account, because the diagnosis never changed, did it? Is there anything in this record that she is no longer suffering from bipolar disorder? There is very little mention in the treatment records as to specifically plaintiffs bipolar disorder. It's mostly as to her depression. Are you saying that she was not diagnosed with bipolar? No, Your Honor. I'm asking you, is there anything in the record to say that she was cured? No, Your Honor. Well, then, so these things that Dr. Sarmadi talked about, they're consistent with that diagnosis, aren't they? Yes, they are. Right. So you counted that only because she didn't ramp up with medication? No, not only that, Your Honor. What is it that you really based on? You're discounting an undisputed DSM-3 diagnosis that you now, where you say it is severe, they seem to be consistent, it's been over a long period of time. What is it that discount that the Social Security Commission can say, oh, cheer up, you can work? Well, Your Honor, bipolar disorder is a very, both bipolar disorder and depression are wide-ranging diagnoses that cover a really wide variety of symptoms and severities. Understood. That's why we're looking at her. Right. So the ALJ was entitled to take a look at the symptoms Ms. Strumgold reported, as well as the longitudinal treatment records of plaintiff's treating physician, Dr. Luther, which shows that during this time period, plaintiff's mental health conditions were very well controlled, in that she wasn't reporting that there were any issues coming up with her depression or her bipolar disorder, as opposed to Ms. Sarmadi's very conclusory statements. Where in the record does it say that she was no longer suffering from depression? Not that she was no longer suffering, but that is. Right. It's not. There isn't. So where are you coming up with that now she's well, and that she's, and this is mild. I'm just trying to, you know, it can't be whole cloth. I mean, in the sense that where is there any evidence that she's no longer suffering from the depression and those symptoms based on the PTSD and the bipolar disorder that she's been treated for since 2015? Where is the evidence that she's well? Your Honor, no one is saying that she is not suffering from these conditions, only that her symptoms were treated to the extent that she was allowed to work with the very strict work limitations imposed by the ALJ. Notably, the ALJ did not find that she was able to go back to the sort of skilled work that she had been doing before working at Social Security. The restrictions that he put in her RFC take a lot of these limitations into account. In fact, including that she shouldn't be having any interactions with the public and very few interactions with supervisors. So it's not the case that she. So she has a final job with no supervisor, not the public. So I guess the usual ticket taker type thing, cashier, wouldn't work that many times. That that wouldn't work. What would the work be? Excuse me, Your Honor. Let me double check what the, I believe that's an issue of the vocational expert. Yes, it would be. I was just wondering what it means. It was ticking off the things that you found in this job that exist. The vocational expert testified the plaintiff would be able to perform a job as a marker. A marker? What's a marker? Your Honor, I do not know. You don't know? And you expect the court to be able to justify a decision about vocational residual ability? That's all I have. Would you like me to answer that question, Your Honor? You did answer the question. You don't know. I'm not going to believe that you don't know. Unless this court has any other questions, the government rests on its briefs. Judge Gregory, do you have any further questions? No, I have nothing further. Thank you very much for your argument. Thank you, Your Honor. Mr. Farrell? I hope I have an answer. I apologize if my argument was not clear. Ms. Drumgold had a prior application for benefits and was denied in that claim. The time period that my colleague is referring to during that time, the Lexapro that she's referring to did improve her condition. She then subsequently filed a new claim, and the judge in this claim found that, in fact, her mental health condition had worsened. The criteria, the B criteria of the evaluation of the daily activities and the things she was doing, some of the categories went from mild to moderate. And so when you look at Dr. Luther, in response to your question, Judge, during the relevant time, Dr. Luther might have seen my client six times, as my colleague mentioned. During that time – Can I just follow up on Judge Gregory's question? I didn't know what a marker – do you know what a marker is? I do, Your Honor. There's a whole regulation about it. Can you just tell me what it is? A marker is the person who, in the store – I'm not sure this job exists much – but who goes in the store and opens up the case of pumpkin pie filling and stamps each one with the price on it and then puts it on the shelf. A marker that attaches price tickets to articles of merchandise. Yes. It goes on and on. Yes. At least the expert here testified that there are 130,000 such jobs that fall within that DOT category. Do you have some of the claimant's limitations? Yes. No question. There are. What he excluded in his hypothetical was the completing a normal workday, the completing a normal workweek, being able to attend and cooperate and interact with everybody at a normal level. The judge did include some interaction limitations in the hypothetical, but the completing a workday, the completing a workweek, the regular attendance, which everybody agrees she's going to have problems with, that appears nowhere in the hypothetical. In the hypothetical, that's what's asked of the vocational expert?  Correct. And then on cross-examination, the representative asked those limitations, and he said, yes, those limitations are work preclusive. In my view, a treating doctor who sees the client six times during the relevant period, mostly for physical problems, is aware of their mental health. I'll take the most conservative interpretation of the mental health professional's attendance. In the six years, if she only saw her once a month, that's 70 times. She knows her intimately. The consultant sees her, and that's his field of expertise, not Dr. Luther. And so when you consider that, I don't think those six visits, if I may finish, Your Honor, I don't think that those six visits constitute substantial evidence, and I don't think they're consistent with the record as a whole, given that that doctor wasn't treating her for that, other than providing the medications that the therapist and another psychologist verified she needed. Thank you, counsel. Thank you. You don't have any more. You don't have any more. We'll come down and recounsel, and then we'll move into our last case.
judges: J. Harvie Wilkinson III, Roger L. Gregory, Julius N. Richardson